[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Dustin S-F., whose date of birth of January 19, 1988, is a child who has been in foster care for all but the first eleven months of the two years and nine months of his life. Dustin was the object of an order of temporary custody issued by the court on December 16, 1988, and on January 27, 1989 he was adjudicated to be a neglected child, having been denied proper care and attention and being permitted to live under conditions injurious to his well-being. The child was committed to the custody of the Commissioner of the Department of Children and Youth Services ("DCYS") on January 27, 1989 and that commitment was extended by order of the court on June 8, 1990.
A petition seeking to terminate the parental rights of his mother, Doreen S., and father, Gary F., was filed by DCYS on May 11, 1990, alleging as grounds for termination: (1) failure to rehabilitate, (2) acts of commission or omission, and (3) no ongoing parent-child relationship.
The petition was last amended on October 31, 1990, the day of trial, without objection from the parties, to include all facts existing up to the day of trial. On the day preceding the trial, father voluntarily consented to the termination of his parental rights, and on October 31, 1990 the court terminated father's parental rights to Dustin, after finding it to be in the best interest of the child. CT Page 4246
FACTS
Evidence offered at trial, interpreted in the light of the prior record in this court concerning these children of which the court has taken judicial notice, permits the finding of the following facts.
On December 16, 1988, after living with his mother for the first eleven months of his life, Dustin was placed in foster care pursuant to an order of temporary custody. He has remained in foster care ever since. On January 27, 1989, the child was committed to the custody of DCYS after the court (Klaczak, J.) adjudicated him to be neglected. At the same time the court set established formal expectations of the mother with respect to her hopeful reunification with the child. Included within these expectations were the requirements that she cooperate with DCYS, visit regularly with the child, participate in individual and parenting counseling, obtain adequate housing and obtain an adequate source of income. As of the date of trial mother has not obtained adequate housing or an adequate source of income, nor has she satisfactorily entered into an individual counseling program or completed a parenting program. Mother, for the most part, did cooperate with DCYS and visited with her son.
Stan Kasanowski, a DCYS social worker, was assigned to this case in October, 1988. He has been the worker assigned to Dustin throughout the period of commitment. The court finds the testimony of Mr. Kasanowski to be credible.
Mother was referred to the Job Corps through Mr. Kasanowski, and was accepted into a twelve to eighteen month vocational training program on February 1, 1990. She was initially enthusiastic about the program but her participation, which lasted only three months, was punctuated with instances of disruptive and disrespectful behavior. Mother was disciplined and placed on probation within the program for failing to perform her assigned duties and for being absent with out leave. She voluntarily left the Job Corps despite the urging of Mr. Kasanowski to at least remain until she received her high school general education diploma (GED).
Dustin was placed with Ruth Lee, a licensed foster mother, on February 1, 1989. He has remained with the Lee family ever since.
Mr. Kasanowski observed a visit between mother and Dustin on February 10, 1989, during which he observed no recognition of mother by the child. Dustin had no reaction to mother's presence, neither smiling when she arrived nor crying when she left. In fact, there was no responsive reaction at all by the child to the presence of his mother. This is the same observation reported by Dr. Mantell during his clinical evaluations of mother and child in January 1989 and July, 1990, Infra. CT Page 4247
A second disturbing aspect of the February 10, 1990 visit was mother's inappropriate behavior. She referred to the child as "scumbag" and "fatso", and gave the child a $50.00 bill to play with telling him that they had money now.
Initially, mother was permitted only supervised visits with her son in the home of the foster mother. Unsupervised visits were permitted beginning in May, 1989 but were terminated by DCYS in July after a series of incidents of concern to DCYS and the foster mother. Darleen failed to return the child on time on several occasions after her visits, and on one occasion she was three hours late in returning the child. On another occasion the child was observed being driven in a van with benches for seats and with no seat belts. Thereafter, because of mother's irresponsible behavior with respect to the care of the child, visits between mother and child were supervised by DCYS.
In August, 1989 mother, with the assistance of her attorney, entered into a service agreement with DCYS in which she agreed to begin individual and parenting counseling in an effort to reunite her with her son. She did not follow through with that agreement even though she was referred to several agencies for counseling. Some of the counseling services to which Darleen was referred by DCYS included: Child and family Services; Catholic Family Services; Rockville Hospital parenting classes, and Manchester Hospital parenting classes. She did not utilize any of those services. She testified that the attempted to begin parenting classes at a church in Manchester but gave up on that program. Mother testified that DCYS did not refer her to any programs and that she had to do everything on her own. The court does not find mother's testimony credible.
When mother reported a problem with financing transportation in order to visit with Dustin DCYS offered to reimburse her for transportation costs. In addition, DCYS provided mother with a bus pass to facilitate visits.
Gerald Doody, a social worker from the Community Service Program testified that Darleen was referred to him for assistance in April, 1990. He was attempting to assist her in organizing her life, and as a part of that effort he helped her obtain town welfare and made referrals through collateral contacts in an attempt to find a suitable environment for mother and her child. Darleen was successful in obtaining town welfare in September, 1990 only to have it terminated when she failed to report for the town work incentive program. She said that she did not go to work because she wanted to visit with her child. She did not attempt to make alternative visiting arrangements with DCYS to accommodate her work schedule. Mother kept six of the eleven appointments she had with Mr. Doody. He testified that Darleen made no tangible progress. The court finds Mr. Doody's testimony credible
In May, 1990 mother received $3600 from a trust fund. It was the CT Page 4248 plan of mother and DCYS to use that money to set her up in an apartment, establish a small savings account and help her with some vocational schooling. The money lasted about three weeks. Mother told Mr. Kasanowski that she had a "blast". She testified that she gave most of the money to others and spent some of the money on clothes for herself and Dustin.
Mother has had regular visits with Dustin throughout his period of commitment; however, the child continues to show very little, if any, recognition of mother and does not want to be left alone with her. He interacts well with almost everyone else. Dustin calls the DCYS secretary, who sometimes drives him to the visits, Julie; and he calls Stan Kasanowski, Stan; however, he still does not refer to his mother by any name.
Even the foster mother observed that Dustin shows no recognition of Darleen as being his mother. He will not even pick her out in a photograph as someone he knows although he does so with other individuals. She also testified that Dustin does not refer to his mother by any name. "He views her as just another person."
DCYS has permitted "split" visits with mother where one half of the visit is supervised and the other half unsupervised so mother can take the child out of the office by herself in an attempt to foster a relationship between them. According to Mr. Kasanowski, Dustin has became accustomed to the weekly visits with his mother but there is no change in the way in which he relates to her. There is no spontaneity in that relationship.
Mr. Kasanowski observed no progress in mother or in the relationship of the child to mother since Dustin has been in placement. "We are at the same spot as we were when the child was placed almost two years ago." (Testimony of Mr. Kasanowski).
CLINICAL EVALUATIONS:
Dr. David Mantell, a licensed clinical psychologist, conducted two court ordered psychological evaluations of mother and child. The court finds Mr. Mantell's reports and expert testimony credible and has given considerable weight to his observations and opinions concerning this case. "Psychological testimony is rightly accorded great weight in termination proceedings." In re Nicolina T., 9 Conn. App. 598, 605 (1987).
During the first evaluation conducted on January 18, 1989, Dr. Mantell observed no parent-child relationship or bonding between child and mother even though the child was one year of age and had been in foster care for only one month. He found that to be unusual. Several of Dr. Mantell's findings from the report of his first evaluation are reproduced for emphasis. (Exhibit #1). CT Page 4249
 . . . he took a bottle for her, but he showed no joy when in her presence nor any recognition of her. There was no sign of distress, loss, or even recognition when the mother left the room at the conclusion of her time with the child.
 When the foster mother was asked to leave the room so that the child could be with the mother, the child whimpered lightly.
Dr. Mantell testified that he found mother to be psychologically impaired in that her psychological problems interfered in a significant way with her capacity to care for herself and her child.
 By her own description, she lives the existence of a vagabond. In emotional presentation she is unstable, unpredictable, and explosive. She presents strongly with characteristics of borderline personality disorder with disturbance to affect and to cognition. Clearly she is a person who is unable to observe social convention, conform her emotions to reasonable boundaries, to pursue a life that is minimally suitable to the basic needs of the child for safety and continuity as well as nurturent care, and she appears to have no perspective on herself and therefore no inherent capacity presently to profit from advice or to exercise reasonable self-control.
Dr. Mantell testified that following the initial evaluation he recommended that mother obtain treatment for psychological and sociological problems as well as parenting skills, and that she obtain a stable residence and a productive form of daily activity in the form of work or study. He felt that her prognosis for rehabilitation was poor given the fact that she had little insight into her own problems which were chronic in nature.
The second court ordered evaluation conducted by Dr. Mantell was on July 19, 1990. He testified that he observed no major changes or improvement in mother or her relationship with the child between the two evaluations. He testified that mother showed impaired judgement as to the most elementary aspects of caring for the child.
Dr. Mantell found the child to be friendly and gregarious. He interacted well with the foster mother, whom he referred to as mom, but avoided his biological mother. Not only did the child fail to refer to Darleen as "mom", but he did not refer to her by any name at all.
There was no evidence that the child recognized or viewed Darleen as his mother. There was no spontaneous parent-child interaction between Dustin and Darleen. Indeed, he had to be forced to interact with her. Dr. Mantell concluded that there is no parent-child relationship in existence between Dustin and his biological mother.
Dr. Mantell stated his opinion that the potential for development of a positive relationship between mother and child within a reasonable CT Page 4250 period of time is poor. He further stated that this is the same opinion he formulated following the first evaluation and he was now re-expressing it with a higher level of certainty.
According to Dr. Mantell, mother's attachment to Dustin is proprietary in nature: that is he belongs to her because she created him. He expressed the opinion that mother's attachment to the child is genuine but not sufficient to move her to do those things and make those changes in her life which are needed to be able to care for the child. Dr. Mantell found the child to be bonded with his foster parents who he identified as his psychological parents.
Finally, Dr. Mantell testified that permanent placement cannot be postponed any longer without irreparable harm being done to the child.
Several of Dr. Mantell's findings from the report of his second evaluation are reproduced for emphasis. (Exhibit #2).
 At the onset, the child interacted with the foster mother. The mother asked the child to come to her and he did not reply.
 The examiner asked the foster parents to leave the room so that the child and the parents could be together. This upset Dustin. He began to tantrum. The mother laughed. . . . The mother acted in a grossly immature, inadequate, and inappropriate fashion.
 Neither parent is able to look after himself or herself satisfactorily. Neither parent is showing the wherewithal that would constitute a minimal foundation of stability and constructive capacity to assume the custody of a dependent child.
 Both parents show serious personality problems that significantly interfere with and preclude, in the judgement of this examiner, their respective abilities to develop and discharge a satisfactory childcare responsibility.
 The examiner feels that both parents have a very poor prospect for rehabilitation within the foreseeable future. . . . The examiner considers it unlikely that any form of counseling can materially change the pattern of adjustment the parents have shown. Perhaps the process of maturation can do this but such benefit is not foreseeable at this time.
ADJUDICATION:
ACTS OF OMISSION OR COMMISSION:
In order to terminate mother's parental rights on the ground of acts of commission or omission under Section 17-43a(b)(3) the Court must clearly and convincingly find that the child was denied the care, CT Page 4251 guidance or control necessary for his physical, educational, moral or emotional well-being as the result of an act or acts of commission or omission by the mother. (Emphasis added.).
The fact that mother has not personally provided Dustin with the care, guidance or control necessary for his basic needs or his physical or emotional well-being does not mean that he has been deprived of this care. Indeed, quite the contrary is true. His foster parents have more than adequately cared for this child and provided for his needs over the past two years.
A child of Dustin's age does not care who provides him with love, nurturing and the necessities life. As far as he is concerned the foster parents are his psychological parents and caregivers.
The court finds that the petitioner has not proved by clear and convincing evidence that Dustin has been deprived of any necessary care by acts of commission or omission on the part of the respondent mother. Without proof of deprivation of care, this ground cannot be found. In Re Juvenile Appeal, 192 Conn. 254, 267 (1984).
NO ONGOING PARENT-CHILD RELATIONSHIP:
Section 17-43a of the Connecticut General Statutes defines this ground as the absence of an:
". . . ongoing parent-child relationship which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child[ren] and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of the child[ren]."
The fact that there has been some contact between mother and this child subsequent to his commitment in January, 1989 until the time of trial . . . "does not preclude a determination that there has been no ongoing parent-child relationship for a period in excess of one year". In re Juvenile Appeal, (Anonymous), 181 Conn. 638, 646 (1980).
The court finds that the petitioner has proven by clear and convincing evidence that there is no ongoing parent-child relationship in existence between Darleen and her child, and that this condition has existed for more than one year.
Even though mother provided cared for Dustin for the first eleven months of his life, Dr. Mantell found no existence of strong bonding or a parent-child relationship at age twelve months. In addition, he found no evidence of a parent-child relationship at age two and one half years, even though mother had been visiting with the child on a regular basis during the intervening period of time. CT Page 4252
While mother has visited with her son over the two years he has been in foster care the child does not recognize her as his mother. He does not respond positively to her presence, he does not even respond with recognition when presented with a photograph of her, and he does not call her by a name. It is clear that the child has no present positive memories or feelings for his natural mother. See: In Re Juvenile Appeal 84-6), 2 Conn. App. 705 (1984). Dustin shows no discernible difference in his relationship with his mother and other non-familiar adults. See: In Re. James T., 9 Conn. App. 608, 616 (1987).
This lack of interaction existed when the child was first placed in foster care and has not changed over the intervening two years. It is clear that the relationship that normally develops develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of her child does not exist in this case.
Even though no parent-child relationship exists, that alone is not grounds to terminate a parent's rights. The court must also find by clear and convincing proof that to permit further time to establish such relationship would be detrimental to the best interest of the child.
Dustin is almost three years old and has been in foster care for approximately two thirds of his life. There has been no discernible progress in establishing a relationship between mother and child, and mother has made absolutely no personal progress in being able to care for her child, over the past two years. Based upon Dr. Mantell's evaluations, it is unrealistic to expect any progress within the foreseeable future.
Dustin must not be required to wait any longer to determine whether his mother will ever be able to fill her parental role. Dustin may well be an adoptable child at this time in his life. He will become less adoptable as time passes resulting in a reduction of his chances for permanency with a loving, nurturing family.
The court is persuaded by clear and convincing evidence that to allow further time for a parent-child relationship to develop in this case would be detrimental to the best interests of the child.
FAILURE TO REHABILITATE:
Section 17-43a(b)(2) of the General Statutes provides for the termination of parental rights in the situation where a parent of a child who has previously been adjudicated as being neglected fails to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time said parent would assume a responsible position in the life of the child, considering the age an the needs of said child. The court finds clear and convincing evidence that Darleen has not achieved such degree of personal rehabilitation, and CT Page 4253 that this situation has existed for more than one year.
With the exception of visiting with Dustin, mother has done nothing to fulfill expectations entered by the court at and subsequent to the time of commitment. The observations and testimony of Mr. Doody, Mr. Kasanowski, and Dr. Mantell were that mother has made no discernible progress in establishing parenting skills, employment skills, organization skills or independent living arrangements over the past two years. She continues to be significantly impaired and her prognosis continues to be poor. She is no closer to being able to care for her child now than she was at the time of his commitment.
The Court finds that because of mother's psychological impairment, her prior personal history, and her continuing failure or inability to accept and utilize the exceptional amount of help offered to her over the past two years it is most unlikely that she will ever be able to develop the skills needed to care for this child. See: In re Juvenile Appeal (84-3), 1 Conn. App. 463, 478 (1984).
Pursuant to In Re Shavoughn K., 13 Conn. App. 91, 98 (1987), the court's required findings as to the six factors listed in Sec. 17-43a(d). are as follows:
 (1) Numerous services have been offered to mother over the past two years in an effort to reunite parent and child. Included among these services were; referral to the Job Corps for vocational and educational training; town welfare assistance, Child and Family Services; Catholic Family Services; Rockville Hospital and Manchester Hospital parenting classes. Mother did not utilize or failed to follow through with those services. In addition, visitation with Dustin was arranged for mother by DCYS and mother was provided with bus passes and transportation reimbursement to that she could visit with her son.
 (2) Mother complied with the orders of the court to participate in psychological evaluations. She did not, however, fulfill the expectations set by the court at and subsequent to the commitment of the child.
 (3) Dustin does not have any positive feelings for his biological mother. He does not recognize her as his mother and does not treat her any differently than any other unfamiliar adult. The child is bonded with his foster mother in whose physical care he has been for more than one year.
 (4) Dustin is almost three years of age with a date of birth of January 19, 1988.
 (5) While mother has maintained contact both with Dustin and DCYS, she has not followed through with the advice, assistance, counseling CT Page 4254 and referrals of DCYS and other agencies which were designed to assist her to adjust her circumstances, conduct and conditions to make it possible for her to be reunited with Dustin. She has not made any progress toward reunification in two years.
 (6) Mother has not been prevented from establishing a meaningful relationship with her son by anyone. Every effort has been made to aid and encourage the development of such a relationship. While mother's financial circumstances are poor, they have been recognized and addressed by DCYS, and have not been a factor in her failure to establish a meaningful relationship with Dustin.
DISPOSITION:
It is clear that mother is incapable of providing a permanent, safe, nurturing home for Dustin now, and that she will be unable to do so in the foreseeable future. It is also clear that Dustin cannot remain in foster care any longer. He has already been in a state of uncertainty for two thirds of his young life. According to Dr. Mantell, permanent placement cannot be postponed any longer without irreparable harm being done to the child.
The court finds it to have been proven by clear and convincing evidence that it is in the best interest of Dustin to terminate the parental rights of his mother so that he can be raised in a permanent, secure, nurturing adoptive home.
JUDGEMENT
Having considered the foregoing, and having found by clear and convincing evidence that it is in the best interests of the child to terminate his mother's parental rights, it is ORDERED that the parental right of Darleen S., in and to her son Dustin, are hereby terminated. It is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing said child forthwith in adoption, and to secure that end, the said Commissioner is further ORDERED to submit to the court in writing no later than 90 days from the date of this judgement a report as to the progress toward such adoption and thereafter to report at such times and in such form as the court may from time to time require.
Terence A. Sullivan, Judge.